No. 9049.

LEISY & CO. VS. WM. BUYERS ET AL.

The condition in a charter-party, " Vessel to have lien on cargo for freight, dead freight and demurrage," though binding between the parties, only affects cargo shipped by third persons when the latter, expressly or impliedly, have consented thereto.

Mere knowledge of the existence and terms of the charter-party, if accompanied by no modifying facts, might suffice to bind the third shipper to its conditions. But when the course of dealing of the vessel has been such as to lead shippers to suppose that the conditions would not be insisted on, and, under such belief, the goods had been sent to the vessel, and when the vessel's agents must have known, when they received the goods, that the shipper would not assent to the conditions, the implication of consent must fail and defendants should not have laden the goods unless they were willing to give clean bills.

Under the circumstances of this case, held that defendants were bound either to give clean bill of lading or return the goods.

APPEAL from the Civil District Court for the Parish of Orleans. *Tissot*, J.

*W. S. Benedict* for Plaintiffs and Appellants.

*T. J. Semmes & Payne* and *Henry Denis* for Defendants and Appellees.

The opinion of the Court was delivered by

FENNER, J. The case here arises under the same charter-party which was considered by us in Gomila vs. Adams, recently decided; but the relations of the parties and the questions presented are very different.

Here the plaintiffs are third persons whose goods went on board the ship without any express agreement as to their being subject to the conditions of the charter party. On presenting their bills of lading, in the ordinary form, for signature, the captain refused to sign without inserting in them the clauses referring to the charter-party and binding the shippers to its conditions including the stipulated "lien for freight, dead freight and demurrage."

Plaintiffs refused to accept such bills, and demanded clean bills or return of their goods.

This demand being denied, they brought the present suit, accompanied by process of sequestration, wherein they ask judgment against the captain and owners condemning them to return the goods, with damages.

From an adverse judgment plaintiffs have appealed.

Following plain principles of the law of contracts and well considered authorities, we held in the Gomila case, that the stipulation in the

charter-party, " vessels to have a lien on the cargo for freight, dead freight and demurrage," was valid and binding as between the parties, and gave the vessel the right to refuse cargo not subjected to such lien.

The effect of such stipulation upon cargo shipped as the property of third persons has been considered in sundry cases. It is well settled that where the shipper has accepted bills of lading expressly subject to the conditions of the charter-party, his goods fall under the lien. Porteous vs. Watney, 3 L. R. Q. B. Div. p. 534.

Even in absence of such clause in the bills, the original shipper might perhaps be bound if he shipped with full notice of the charter-party and its special provisions, though indorsers of his bill would not be bound. Foster vs. Colby, 3 H. & N. 705; McLean vs. Fleming, 2 L. R. Sc. App. 128.

On the other hand, it is firmly held that third persons shipping without notice of the charter-party, are not bound, and if their goods have gone on board, are entitled to demand clean bills or a return thereof. Peck vs. Larsen, 12 L. R., Eq. C. p. 377 ; Grand vs. The Ibis, 3 Woods, U. S. C. C. 28.

We think we stated the correct doctrine, in general terms, in the Gomila case, when we said that " the vessel would have no such lien upon cargo shipped by third persons, unless the latter had *expressly* or *impliedly* consented thereto."

Indeed, even when the bill of lading contains express reference to the charter-party, the rule seems to be that, in order to charge the shipper or endorsee of the bill with any other obligation than the payment of freight, plain words to that effect should be used. Smith vs. Sieveking, 4 E. & B. 945 ; Wegner vs. Smith, 24 L. J. C. P. 25 ; Chappell vs. Comfort, 31 L. J. C. P. 58 ; Grey vs. Carr, L. R. 62 B. 522; Russell vs. Niemann, 33 L. J. C. P. 358; Gage vs. Morse, 94 Mass. 401.

The touch-stone of the present controversy lies in the determination of the question whether or not the plaintiffs, expressly or impliedly, assented to these conditions. If they did, the vessel had the right to require them to accept bills making such conditions effective, and was not bound to incur the labor, expense and inconvenience of unloading the goods. If, on the other hand, the goods were received without such consent, the vessel was bound either to sign clean bills or to return the goods. Peck vs. Larsen, above cited.

If there were no other attendant facts than the existence of the charter-party, and knowledge thereof by plaintiffs or at least by their agent, prior to and at time of sending the goods, we should have little

difficulty in inferring the clearly implied consent of plaintiffs, to its conditions, and in maintaining the judgment appealed from.

But if we find from the evidence that, notwithstanding ·the charter-party, the course of dealing of defendants with shippers generally and with plaintiffs' agent in particular had been such as to lead them to suppose that its conditions would not be insisted upon, and that goods would be received under clean bills of lading, and that under such supposition and belief the goods had been sent to the vessel, and that defendants must have known, when they took the goods on board, that plaintiffs would not be willing to assent to the conditions of the charter-party; we think that the attempted implication of consent must fail, and that defendants should not have taken the goods unless they were willing to meet the known expectations of plaintiffs.

We have studied the evidence with great care, and although plaintiffs' agent perhaps acted with less caution than extreme prudence might have dictated, we are yet convinced that the dealings and communications of defendants authorized him to believe that the cotton would be received under clean bills; and still more clearly are we convinced that the defendants knew, at the time when they took the goods on board, that plaintiffs would be unwilling, under any circumstances, to subject their goods to. the objectionable lien. Such being the case, defendants had no right to infer or to exact their consent, and should not have received the goods unless they were willing to waive it.

As to their course of dealing, we cannot better signalize its character than by stating that out of 7500 bales of cotton shipped on the vessel, part received before and part after that of plaintiffs, the one hundred bales of the latter, are the *only* ones for which clean bills were not given.

It is undisputed that for a considerable period and up to the very moment of reception of plaintiffs' cotton, defendants had been receiving shipments indiscriminately and giving clean bills therefor. The like course was resumed and continued immediately afterwards.

Plaintiffs' cotton reached the vessel and was taken on board, part on the 19th and part on the 20th of October. The 19th was the day when, under defendants' construction, the demurrage began to run. The agents of the ship had received a cable from the owners to give no more clean bills, unless the demurrage was paid day by day. It is true that plaintiffs' agent was advised of this after the order for sending down their cotton had been given, but as the charterers had not refused

to pay the demurrage and had asked time to consider, it was not deemed worth while to stop the cotton.

On the 19th, the agent, who represented also another shipper, Mr. Jeanrenaud, had an interview with the captain and agents of the ship about his cotton, in which it was stated that, although if demurrage was not paid, he could not get a clean bill under his contract with the charterers, yet if he would obtain a cancellation of the order of Gomila & Co., the charterers, the ship would take his cotton under direct contract and give a clean bill. What more natural than for the agent to infer that plaintiffs would be treated likewise and to conclude that either the demurrage would be paid, or if not, it would only be neccessary to obtain a cancellation of Gomila's order, and, in either case, plaintiffs' would get their bill?

The demurrage was not paid, but Jeanrenaud's cotton went down on the 20th, the very day that the last of plaintiffs cotton was received, and, on his procuring cancellation of Gomila's order, clean bills were given him. Plaintiff obtained like cancellation, but his bills were refused on the inequitable pretext that he was caught by having his cotton down, without first getting the agreement which Jeanrenaud had secured.

Such unjust discriminations cannot be countenanced. The contract sought to be imposed upon plaintiffs is so hard that we share the surprise expressed by one of the learned English judges that any man should ever be willing to enter into such an one. We will enforce the contract nevertheless, when consent thereto is brought home to parties, expressly or by clear implication. But, under the circumstances of this case, we feel that an unjust advantage is sought to be taken of a confiding shipper; that he never consented or intended to consent to this ruinous bargain; and that defendants, when they received his cotton, well knew that he did not and would not consent.

Acknowledging the force and ability with which strict, technical principles of law are arrayed in support of defendants' position, we are of opinion that the circumstances of this case remove it from their application, and that it is one for the application of the maxim, "*apices juris non sunt jura.*"

It is, therefore, adjudged and decreed that the judgment appealed from be annulled, avoided and reversed; and it is now ordered, adjudged and decreed that there be judgment in favor of plaintiffs and against the defendants *in solido*, condemning the latter to return to defendants the one hundred bales of cotton shipped by them on October

19 and 20, 1882, on board the ship "Altnacraig," or to account for the same, and that the sequestration herein issued be maintained, defendants to pay costs in both courts.

Rehearing refused.